Edward JOHNSON, Respondent (51913), Appellant (51964),

v.

Edward J. DIRKSWAGER, Jr., as Commissioner of the Minnesota Department of Public Welfare, et al., Appellants (51913), Respondents (51964).

Nos. 51913, 51964.

Supreme Court of Minnesota.

Jan. 15, 1982.

Warren Spannaus, Atty. Gen., and David McKenna, Sp. Asst. Atty. Gen., St. Paul, Marshall & Savage and Joseph B. Marshall, Circle Pines, for appellants.

Collins, Buckley, Sauntry & Haugh and Theodore J. Collins, St. Paul, for respondents.

Thomas W. Foley, County Atty., and Stephen F. Befort, Asst. County Atty., St. Paul, for amicus curiae Ramsey County.

Tanick & Heins and Marshall H. Tanick, Minneapolis, for amicus curiae MCLU.

Patricia Hirl, St. Paul, for amicus curiae Newspaper Ass'n.

Norton Armour, Minneapolis, for amicus curiae Mpls. Star & Tribune.

David Donnelly, St. Paul, for amicus curiae Northwest Publications, Inc.

Robert J. Alfton, City Atty., Minneapolis, for amicus curiae City of Minneapolis.

Edward P. Starr, City Atty., David W. Nord and Beryl A. Nord, Asst. City Atty., St. Paul, for amicus curiae City of St. Paul.

## OPINION

SIMONETT, Justice.

A jury found that defendant State of Minnesota and its Commissioner of Public Welfare had defamed plaintiff, one of its employees, and awarded damages of $150,-000. Defendants appeal from a denial of their motion for judgment notwithstanding the verdict or a new trial. Plaintiff cross-appeals the order reducing his damages to $100,000 by virtue of Minn.Stat. § 3.736 (1980) and finding the commissioner liable only in his official capacity. Finding the defamation was privileged, we reverse and order judgment entered in favor of defendants.

On May 16, 1978, defendant Edward J. Dirkswager, Jr., Commissioner of Public Welfare, had a telephone interview with Eric Black, a reporter with the *Minneapolis Tribune.* The commissioner told the reporter that plaintiff Edward Johnson had been terminated that day from his position as an assistant group supervisor at the Willmar State Hospital and that the termination was for "sexual improprieties." The next day an article appeared in the *Minneapolis Tribune,* written by Black, reporting that Johnson and a fellow employee had been fired the day before, that the commissioner had said the firing was for "sexual improprieties" occurring in 1970, but had declined to be more specific; that Johnson denied the allegations; and that Johnson's attorney would request a civil service hearing to refute the charges. The article quoted a state legislator as saying Johnson would not be charged criminally because the statute of limitations had expired.

Johnson did contest his termination. Five months later, after a hearing, Johnson was cleared of all charges and reinstated to his job. This result was affirmed by the state Department of Personnel and the district court and summarily affirmed by this court on January 21, 1981.

Johnson started this lawsuit in December 1978, alleging counts of breach of contract, negligence, defamation and a civil rights action under 42 U.S.C. § 1983 (1981). By special verdict the jury found liability for defamation. It also found, however, that defendants had not acted outside the limits of their lawful authority under Minn.Stat. § 43.24 (1980), so the civil rights claim failed.[1]

On appeal, defendants raise a multitude of issues and defenses: (1) the commissioner, as a cabinet-level official, had an abso-

---

1. Minn.Stat. § 43.24 (1980) sets out the procedure for removal of a permanent employee in the state's classified service.

lute common-law privilege to make a defamatory statement in connection with informing the public of his official actions; (2) the privilege is absolute not only because of the commissioner's high level position but because the facts of termination were public data which the commissioner, under the Data Privacy Act, was required to make available to the public; (3) in any event, the commissioner had a qualified privilege, that plaintiff Johnson was a "public figure" embroiled in a matter of public interest, so that the requirement of "constitutional malice"—the statement being made with knowledge of its falsity or with reckless disregard of the truth—was not proven; or (4) if the commissioner was not a "public figure," there was no proof of common-law actual malice as a matter of law; and, finally, (5) plaintiff's claim is barred by the state Tort Claims Act, since defendants were engaged in a discretionary function and in exercising due care in the execution of a valid statute, the Data Privacy Act.

We need not discuss all of these issues and their many ramifications. It is enough to dispose of this case that we discuss only the truthfulness of the defamatory statement and the existence of an absolute privilege, particularly in the context of the Data Privacy Act and the Tort Claims Act.

## I.

Plaintiff's entire case for defamation hinges on Commissioner Dirkswager's statement to newspaper reporter Black that Edward Johnson had been "terminated for sexual improprieties." For this communication to be actionable, it must both defame and be untrue. "[T]rue statements, however disparaging, are not actionable." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). Plainly, the communication defames, but is it untrue? We find this threshold question, though not raised by appellants, to be troublesome.

The jury found the communication was not substantially true. It is apparent from the record, however, that notwithstanding the wording of the special verdict question,[2] the jury understood it was deciding whether, in fact, Johnson had engaged in the alleged sexual improprieties and not whether, in fact, the reason for termination was sexual improprieties—a fact, of course, which was admitted.[3] Both parties called witnesses on the issue of whether or not the sexual misconduct had occurred. Thus the defamation trial became, to some extent, a retrial of the termination proceedings, with the jury knowing that Johnson had been exonerated previously but being told they were not to consider this fact.

There seems to be little authority as to whether truth as a defense goes to the verbal accuracy of the statement (Johnson is terminated for sexual improprieties) or must go to the underlying implication of

---

2. The jury was asked:

   1] Was the communication by Edward J. Dirkswager, Jr., to Eric Black, advising Black that Edward Johnson had been terminated for "sexual improprieties", defamatory on its face? [Yes or No]      Yes

   2] Did Edward J. Dirkswager, Jr., negligently communicate to Eric Black the statement recited in Question No. 1? [Yes or No]      No

   3] Was the communication recited in Question No. 1 substantially true? [Yes or No]      No

   The trial court answered the first question "yes," holding as a matter of law that the communication was defamatory on its face. The jury then answered Question No. 3 "no." The verdict form then went on:

   4] Did Edward J. Dirkswager, Jr., have a qualified privilege to communicate to Eric Black the statement recited in Question No. 1? [Yes or No]      No

   5] Was the communication from Edward J. Dirkswager, Jr., to Eric Black, recited in Question No. 1, actuated by actual malice? [Yes or No]      Yes

   In subsequent questions the jury awarded $150,000 compensatory damages but no punitive damages. As stated, on the civil rights claim it found, in answering a further question, that defendants did not act outside their lawful authority.

3. The court file shows the jurors were also puzzled, since during their deliberations they submitted this question: "Question 3. What does this refer to: a) Is the communication true or b) Are the allegations true."

the statement (Johnson engaged in sexual improprieties; therefore, he is terminated). An English case observes, "The announcement that A is charged with murder cannot per se mean that he is guilty of murder. A fortiori the announcement that the police are making inquiries about him in connection with a murder cannot per se mean that he is guilty of murder." *Lewis v. Daily Telegraph Ltd.*, 1 Q.B. 340, 374 (1963), Holroyd, Pearce, L.J. (C.A.).

■ Although the truth defense is a threshold issue which we believe should be noted, we decline to base our decision on this issue.[4] The issue has not been raised by appellants nor briefed. We choose, instead, to rest our decision on absolute privilege, the next issue to be discussed.

## II.

Considering Dirkswager's communication to be false as well as defaming, defendants first argue that the commissioner is entitled to an absolute privilege to make the communication. Whether an absolute privilege should be extended to public executive officials is a matter of first impression in this state. We conclude an absolute privilege does exist here.[5]

To discuss this issue properly, we first need to elaborate on the facts. Throughout 1977, as a result of an inquiry by a state legislator, an investigation was being conducted by agents of the Minnesota Bureau of Criminal Apprehension into allegations of patient abuse by staff employees at the Willmar State Hospital. Several employees were involved. As part of the investigation, Johnson was implicated in connection with events that were claimed to have occurred 7 years earlier, in 1970. Indeed, it was learned that those same allegations about Johnson had been the subject of an in-house investigation by hospital officials in 1974. There being no supporting evidence for the allegations, the matter was simply left open, with Johnson to be kept under observation.

The BCA agents interviewed four hospital employees and eleven persons who had been patients at the time of the alleged incidents. Summaries of those interviews were submitted to the county attorney for Kandiyohi County, who concluded that there was sufficient evidence to provide probable cause for criminal charges, but that the statute of limitations had run. The investigation report was forwarded to attorney Barbara Gill of the Attorney General's office, who read the report and then presented it to Commissioner Dirkswager. Dirkswager read the report, discussed it with the Willmar State Hospital administrator, attorney Barbara Gill and others, and also asked his deputy commissioner, James Hiniker, to read it. Hiniker sent a state tort claims officer to talk to the BCA investigators, who reported that the BCA agents considered the former patients making the accusation to be credible. Hiniker recommended to the commissioner that Johnson be terminated.

On the basis of these developments, and after he "worried a lot," Dirkswager decided Johnson should be fired. Although he considered the 1974 in-house investigation which had cleared Johnson, he had misgivings about it, particularly in view of the ineffective manner in which, in Dirkswag-

4. In his brief plaintiff Johnson considers it significant that the commissioner did not preface his phrase "sexual improprieties" with the word "alleged," but we fail to see any significance in this. It is clear from a reading of the *Minneapolis Tribune* article, as well as from reporter Black's testimony, that Black understood that the commissioner was stating only allegations of misconduct. The newspaper article, in its second paragraph, says the commissioner declined to be more specific "about the allegations," and later in the article it is said, "Ed Johnson was fired Tuesday for alleged sexual impropriety in a 1970 incident." Indeed, at oral argument, plaintiff's counsel conceded that the failure of Dirkswager to have qualified his statement with the word "alleged" was not essential, since it was plaintiff's position that even if the commissioner had said "alleged sexual improprieties" the communication would still have been defamatory.

5. The trial court was doubtful that an absolute privilege existed and properly decided, in order to avoid a retrial in the event there was no absolute privilege, to submit the issue of a qualified privilege to the jury.

er's opinion, the hospital administration had handled similar matters in the past. Dirkswager testified that his decision was made because of his concern for the welfare of the patients.

Johnson was first given an opportunity to resign, which he refused. On May 16, 1978, Johnson was given his termination letter.[6] Dirkswager, knowing that he would be receiving inquiries from the newspaper reporter, asked attorney Barbara Gill if, under the Data Privacy Act, he had a duty to answer the reporter's questions about the dismissal once Johnson had received the termination letter. Gill advised him that the letter could be classified as a public document once Johnson had received it and that, therefore, the information contained within it was public.

It was in this setting, then, that Dirkswager talked by telephone with newspaper reporter Black later in the day on May 16 and gave him the information which gives rise to this lawsuit. It is in this setting that defendants claim an absolute privilege.

1. We have held that participants in judicial and legislative proceedings are entitled to an absolute privilege, a grant of total immunity for false and defamatory statements regardless of the nature or intent of the speaker. *See, e.g., Matthis v. Kennedy,* 243 Minn. 219, 67 N.W.2d 413 (1954); Minn.Const. art. 4, § 10. We have not, however, considered the applicability of an absolute privilege to executive officials, and Johnson, citing our caveat in *Matthis* that the privilege should be "confined within narrow limits," urges us not to extend the privilege to apply here.

We also said in *Matthis* that the absolute privilege should be confined to situations where the public service or the administration of justice requires it, keeping in mind that the purpose of the privilege is not so much to protect public officials but to promote the public good, *i.e.,* to keep the public informed of the public's business. Thus Restatement (Second) of Torts § 591 (1977), says:

> An absolute privilege to publish defamatory matter concerning another in communications made in the performance of his official duties exists for
>
> \*     \*     \*     \*     \*     \*
>
> (b) a governor or other superior executive officers of a state.

Comment c to this section says, "All of the state courts that have considered the question have agreed that the absolute privilege stated in Clause (b) protects the superior officers of the state governments, including at least the governor, the attorney-general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government."[7]

2. The Commissioner of the Minnesota Department of Public Welfare clearly, it seems to us, holds a high level, cabinet-equivalent position in state government. The commissioner helps formulate policy and has ultimate administrative responsibility for the state's hospitals and welfare programs, with an annual budget exceeding a billion dollars. He or she is Minnesota's counterpart of the Secretary of the United States Department of Health and Human Services. This case is like *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), in which the United States Supreme

---

**6.** This letter was given pursuant to Minn.Stat. § 43.24 (1980), which provides that before discharge is taken for "just cause," the employee shall be furnished with a written statement "setting forth the reasons for the disciplinary action." The letter stated that the suspension and dismissal were for inappropriate sexual behavior with adolescent patients, cited an incident in January 1970, another in March 1973, and a course of conduct since 1970, specifying kinds of specific conduct. The letter explained that a reply could be made in 5 days to the hospital's chief executive officer and that a

hearing could be requested to appeal the action.

**7.** An absolute privilege was afforded in the following cases: *Ryan v. Wilson,* 231 Iowa 33, 300 N.W. 707 (1941) (governor); *Blair v. Walker,* 64 Ill.2d 1, 349 N.E.2d 385 (1976) (governor); *Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705 (1969) (secretary of state); *Gold Seal Chinchillas, Inc. v. State of Washington,* 69 Wash.2d 828, 420 P.2d 698 (1966) (attorney general); *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (1952) (attorney general).

Court held that the Acting Director of the Office of Rent Stabilization had an absolute privilege to communicate to the public through a press release the defamatory reasons for the suspension of his deputy director.

3. Johnson argues, however, that the defamation arises out of an employer-employee relationship where no more than a qualified privilege is appropriate, where, then, malice defeats the privilege and allows imposition of liability. *See McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 235 N.W.2d 371 (1975). Also argues Johnson, the proliferation of government in today's society is a policy reason to restrict, not expand, the immunity of government officials.

We view the question differently. Here the employer is the body politic, the state. More than an individual's employment concerns are involved. Also involved is the administration of the state hospital system, the use of public funds, the execution of public health care policies, and the welfare of adolescent patients in the state hospitals. The public has more than an idle interest in this public business. One way to hold public officials accountable for their actions is to subject them to lawsuits. But in instances like this one, it would seem government can best be held accountable by assuring that its top-level representatives have no excuse not to speak out in the performance of their duties. If they speak out falsely and from ill motives, it is expected that their remarks will be exposed for what they are worth. It seems to us that the same policy considerations that warrant an absolute privilege for those in the legislative and judicial branches of government apply to the executive branch.

We do not have before us the nature or extent of any privilege for inferior governmental officers. We are dealing, it must be remembered, only with top-level, cabinet-equivalent executives and, as to them, the observations of the United States Supreme Court in *Barr v. Matteo* are pertinent:

It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of their duties— suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434.

What is involved here, of course, is the difficult and sensitive task of balancing the public's right to know with a defamed individual's right to redress. In this instance, we conclude the balance is to be struck in favor of the public's right to know.

■ 4. Even if an absolute privilege exists, Johnson then contends it must be denied here because the communication was not one of the commissioner's duties; that the commissioner usurped the duties of the Chief Executive Officer of the Willmar State Hospital, who was the proper person to deal with Johnson and with the press about Johnson. We think not. The interest in the controversy about the Willmar State Hospital was statewide, the ability of the local administrator to handle it was in doubt, and the commissioner was within the ambit of his duties to act as he did.

■ 5. We find in the Data Privacy Act confirmation of our conclusion that an absolute privilege exists. Minn.Stat. §§ 15.-162–.1671 (1978), amended and renamed in 1979 as the Minnesota Government Data Practices Act, Minn.Stat. §§ 15.1611–.1698 (1980), and amended again by 1981 Minn. Laws, ch. 311. This case, of course, arose under the Act as it was in 1978. The commissioner argues that once the termination letter was delivered and was "public," he had no choice but to release the contents of that letter. We agree. In this instance, the legislature, too, in balancing the public's right to know with the individual's right to privacy, has struck the balance in favor of the public.

Under the Data Privacy/Practices Act, all government data is public unless classified otherwise, that is, classified as not pub-

lic or, in the case of individuals, either private or confidential. Section 15.162, subds. 3, 5, 5a (1978). All public records must be accessible for inspection and copying at reasonable times by any person. Section 15.17, subd. 4 (1978). For violation of the Act, the responsible authority, such as the commissioner, could be liable for both civil and criminal penalties, as well as loss of his or her job. Sections 15.166, 15.167 (1978).

When Commissioner Dirkswager spoke to the newspaper reporter in May 1978, he had three kinds of data before him: the records of the Willmar State Hospital concerning the complaining patients and the personnel information on employee Johnson; the investigation reports of the Bureau of Criminal Apprehension; and any records of his own department, including the letter of termination to Johnson. The sole question before us is whether the commissioner was required to disclose the contents of the termination to the newspaper reporter.[8]

■ 6. Johnson concedes the letter of termination itself became public data upon its issuance to him.[9] We agree. Johnson

also concedes the commissioner could then have given a copy of the letter to the newspaper reporter. Johnson argues, however, that "data," when referred to in the Act, means only information that is in some kind of "physical form," information capable of "storage." Section 15.162, subd. 3 (1978). In other words, as we understand Johnson's argument, only physical data, such as the letter itself, could be made public, but what the commissioner might have in his mind or what the commissioner might say about what was in the letter could not be made public.

We think this distinction is artificial. If the letter is public, so are its contents. While it may be true, as Johnson argues, that nothing in the Data Privacy Act requires the commissioner to speak to a reporter, certainly the commissioner might do so and is often expected to do so, and if he does, it is no violation of the Act to tell the reporter about the contents of a public document.[10] We so hold.

■ 7. So here, where the defamatory statement appears in the context of the

---

8. The letter of termination, in referring to instances of misconduct with minor residents, mentioned no names of patients. As to two incidents, the patient was referred to simply as "resident O."

9. Minn.Stat. § 15.162, subd. 2a (1978), provided that data on an individual was confidential if "collected by a civil or criminal investigative agency as part of an active investigation undertaken for the purpose of the commencement of a legal action." One might argue, as apparently the state does, that the letter of termination might be confidential since based on data collected in the investigation but it lost its confidentiality when the investigation, or at least that part of it on which the decision to terminate was made, ceased to be "active," which was when the commissioner decided to terminate. Johnson does not contend otherwise.

In 1979 the legislature amended the Act to provide that certain "personnel data" is public, and included in such public personnel data is "the status of any complaints or charges against the employee, whether or not the complaint or charge resulted in a disciplinary action." Minn.Stat. § 15.1692, subd. 2 (1980). Clearly, under this amendment the letter of termination would have been public.

10. Of course, if an oral summary of the contents of the letter is given, it must be accurate.

Such was the case here. It is evident the commissioner chose to summarize the contents of the letter for the newspaper reporter to lessen the damaging publicity for Johnson. Rather than give the four specific instances of misconduct, the commissioner simply referred to them as "sexual improprieties." It is worth noting that the amended Act itself seems to have in mind more than data in physical form, since it not only permits public data to be inspected and copied, but also, "if the person requests, he shall be informed of the data's meaning." Section 15.1621, subd. 3 (1980).

Johnson says that the commissioner "misconveyed" the contents of the termination letter to Black, but this is not so. Johnson argues that the commissioner did not make clear that the allegations arose from "an incomplete investigation, consisting of unsworn-to accusations unsubstantiated by witnesses, or physical evidence involving an alleged action which had occurred some eight years earlier * * *." But none of this was in the termination letter, except that the main accusation arose out of conduct in 1970 and Black was told this. Johnson is not arguing the accuracy of the termination letter and the portrayal of its contents but whether there was probable cause to issue the letter in the first place—a different question.

mandate of the Data Privacy Act, further support is afforded for an absolute privilege, since "one who is required by law to publish defamatory matter is absolutely privileged to publish it." Restatement (Second) of Torts § 592A (1977). We note, too, that the Minnesota Tort Claims Act declares "that the state and its employees are not liable for the following losses: (a) Any loss caused by an act or omission of a state employee exercising due care in the execution of a valid or invalid statute or regulation * * *." Minn.Stat. § 3.736, subd. 3 (1980). We conclude that this protection against liability applies to defendant Dirkswager since it appears, as a matter of law, that in disclosing the contents of the termination letter he exercised due care in the execution of the Data Privacy Act. This being so, the statutory language as above quoted also protects the defendant State of Minnesota from liability.

To sum up, we hold as a matter of law that the Commissioner of Public Welfare, as a top-level cabinet-type official in the executive branch of state government, has an absolute privilege, in the performance of his official duties, to communicate defamatory material. In this case, where the defamatory material appears in a letter terminating an employee, we hold also that the absolute privilege prevails because the government's representative was required by law (the Data Privacy Act) to disclose the defamatory material and because, by exercising due care in the execution of that law, the state and its representative are further excluded from liability under the Minnesota Tort Claims Act. We do not reach the many other issues raised by both parties.

One might debate the wisdom of the commissioner's decision to terminate based on the information he then had available, but that is not the issue here. We think it bears repeating that Johnson has been exonerated of all charges against him by not just one but two triers of fact. This is his vindication. He has been reinstated to his position with back pay. In yielding his right to recover something more by way of defamation damages, he yields to the needs of a free, democratic society to be apprised

of the conduct of the public business by its public officials.

Reversed with directions to enter judgment for defendants.

KELLEY, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.