**Edward McGAA, Appellant,**

v.

**Raymond GLUMACK, Chairman of the Metropolitan Airports Commission, et al., Respondents.**

**No. C6–88–2465.**

Court of Appeals of Minnesota.

June 20, 1989.

Review Denied Aug. 15, 1989.

Stewart R. Perry, Shawn M. Perry, Perry & Perry, Wayzata, for appellant.

Wayne G. Faris, Marko J. Mrkonich, Michael C. Connolly, Oppenheimer, Wolff & Donnelly, St. Paul, for respondents.

Heard, considered and decided by HUSPENI, P.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

NIERENGARTEN, Judge.

The trial court granted summary judgment denying appellant Edward McGaa's claims of defamation, tortious interference with contract, and violation of the Minnesota Government Data Practices Act (MGDPA), Minn.Stat. ch. 13 (1985). McGaa appeals. We affirm.

## FACTS

The Metropolitan Airports Commission (Commission) is a governmental agency

created by and responsible to the state legislature and also to the governor of the State of Minnesota, who has the power to appoint certain members of the Commission. Raymond Glumack was Executive Director and later Chairman of the Commission during the time period relevant to this suit. McGaa was Manager of Secondary Airports for the Commission from 1975 until December 15, 1981. McGaa was an outspoken critic of his employer and his relationship with Glumack was antagonistic, such that his continued employment became untenable.

By mutual agreement, McGaa, a Native American, and Glumack traveled to Washington, D.C. in December of 1980 for the purpose of seeking employment for McGaa at the Bureau of Indian Affairs. During this trip, a conversation took place in a Washington, D.C. hotel between McGaa and Glumack which became the basis of this lawsuit. McGaa's version of the conversation was assumed to be accurate in the trial court and will be assumed accurate on appeal.

McGaa claims that Glumack recounted a dream in which McGaa abducted Glumack, flew him to South Dakota in a private plane, and buried him on McGaa's sister's land. Glumack's version is similar except McGaa allegedly divulged a plan to kill Glumack, and no dream was involved. McGaa became aware of Glumack's version of the conversation shortly after returning to the Twin Cities.

On April 2, 1980, Glumack sent a memorandum to McGaa, stating that certain documents regarding McGaa's employment would be kept in a separate file, available at McGaa's request. McGaa immediately requested and was denied access to this file. By August 1981, McGaa had reduced to writing his belief that he had a cause of action against Glumack and the Commission for defamation because Glumack had allegedly stated his version of the Washington, D.C. conversation to other employees of the Commission.

On December 7, 1981, Glumack wrote a memorandum in which he narrated in detail the conversation from his point of view. The memorandum was witnessed by two persons and notarized by the secretary who typed it. Glumack's written version of the conversation was kept in a file separate from McGaa's regular personnel file at the Commission.

McGaa resigned his employment at the Commission on December 15, 1981, pursuant to an agreement where he received a full year's salary as severance pay. Before he resigned, he viewed his personnel file but did not request access to the separate file. In January 1982, with the assistance of Glumack, McGaa obtained a management position at an airport in Las Vegas, Nevada.

In the spring of 1985, McGaa delivered a letter to Minnesota Governor Rudy Perpich and Minnesota State Senator Donald Moe, Chairman of the Governmental Operations Committee, which has Commission oversight responsibility. The McGaa letter was highly critical of Glumack and the Commission and alleged mismanagement, nepotism, and lack of aircraft safety. Governor Perpich went to the Commission and spoke with Glumack, requesting an explanation for the general allegations made by McGaa.

Before the Commission had submitted a response, McGaa had personally advised Senator Moe of Glumack's version of the Washington, D.C. conversation. In July of 1985, the Commission prepared a response to McGaa's allegations, consisting of a 12-page narrative and approximately 60 pages of attached documents. One of the attachments was the December 7, 1981 memorandum in which Glumack described his version of the Washington, D.C. conversation with McGaa.

The response sent to Governor Perpich and Senator Moe was prepared by Commission staff. The trial court found that there was no evidence that Glumack knew that the December 7, 1981 memorandum had been included in the response.

The trial court found that McGaa was unable to produce any non-hearsay evidence to establish that either the governor or the senator read the December 7, 1981 memorandum, and that McGaa was unable

to produce admissible evidence showing that he has sustained any damage as a result of the submission of the memorandum.

## ISSUES

1. Did the trial court err in dismissing appellant's defamation claim based on the alleged publication of the memorandum in 1981?

2. Did the trial court err in determining respondents' submission of the memorandum in 1985 was absolutely privileged?

## ANALYSIS

1. On appeal from summary judgment, the appellate court determines whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn. 1979).

The statute of limitations governing defamation claims is two years. Minn.Stat. § 541.07(1) (1986); *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). McGaa did not file his complaint until August 4, 1986. The trial court concluded that McGaa's claim of defamation based on events in 1981 was time-barred, and that McGaa made no showing of fraud sufficient to toll the statute of limitations. We agree.

McGaa alleges that the 1981 memorandum was fraudulently concealed from him when Glumack kept it in a "secret" file, separate from McGaa's personnel file, thereby tolling the statute of limitations until McGaa learned of the memorandum in 1986.

▆ Concealment must take place through an affirmative action designed to prevent discovery. *Wild*, 302 Minn. at 451, 234 N.W.2d at 795. Lack of knowledge of a defamatory publication will not toll the statute of limitations; the statute of limitations begins to run at the time of publication. *Id.* at 449, 234 N.W.2d at 794.

McGaa never asked to see the so-called "secret" file during the time it contained the memorandum. Consequently, he cannot point to any specific or particular act of fraud by Glumack that would require a trial on the issue of concealment. *See* Minn. R. Civ. P. 9.02.

McGaa failed to demonstrate that at the time of the summary judgment motion *specific facts* existed to create a genuine issue for trial. *See Alexander Construction Co. v. C & H Contracting, Inc.*, 354 N.W.2d 535, 538 (Minn.Ct.App.1984) (citing *Erickson v. General United Life Insurance Co.*, 256 N.W.2d 255, 259 (Minn.1977)) (emphasis added).

2. McGaa also bases a defamation claim against Glumack and the Commission on the submission of the 1981 memorandum to Senator Moe and Governor Perpich in 1985. This claim is timely, but was dismissed by the trial court on the ground of absolute privilege.

▆ The trial court concluded that because Glumack acted in his capacity as chairman of the Commission, "reporting directly to the legislature and governor, any statement" he made "was protected by an absolute privilege" under *Johnson v. Dirkswager*, 315 N.W.2d 215 (Minn.1982) (Commissioner of Public Welfare, held to be a high level, cabinet-equivalent official in state government, with absolute privilege to communicate defamatory statement in performance of his duties).

There are two classes of privileged defamation:

> Absolute privilege means that immunity is given even for intentionally false statements, coupled with malice, while a qualified or conditional privilege grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice.

*Matthis v. Kennedy*, 243 Minn. 219, 222–23, 67 N.W.2d 413, 416 (1954).

McGaa argues that Glumack was not a top-level cabinet-type official in state government when the memorandum was published in 1981 and republished in 1985, and therefore, at best, had only a qualified privilege to distribute the 1981 memorandum, thus presenting questions for trial.

The 1981 publication was time-barred, so we consider only the 1985 publication. By 1985, Glumack had been appointed Chairman of the Commission by the governor. *See* Minn.Stat. § 473.604, subd. 1(7) (1984). We conclude Chairman Glumack holds a high-level cabinet-type position in state government as required in *Dirkswager*, and is entitled to claim an absolute privilege as to his alleged involvement in the 1985 submission.

Further, the Commission was created by the state legislature to develop the metropolitan area as an aviation center correlated with aviation facilities in the entire state, *see* Minn.Stat. § 473.602 (1984), and therefore does not have a local government cast.

Considering the duties and role of the Commission in state government to report to and serve the legislature and governor, and given the high-level position Glumack holds as Chairman, the trial court did not err in concluding an absolute privilege exists under *Dirkswager*.

In addition, the submission of the materials by the Commission was a privileged act done in response to McGaa's own allegations, pursuant to a reporting duty. Public bodies have an absolute privilege to follow the requirements of the law. *Freier v. Independent School District No. 197*, 356 N.W.2d 724, 729–30 (Minn.Ct.App.1984) (school board held protected by absolute privilege to comply with law requiring publication of decision discharging employee, and defamation claim based on contents of such decision was barred); *Dirkswager*, 315 N.W.2d at 223.

The Commission submitted its response to McGaa's allegations pursuant to two legal duties; first, to report to the legislature under Minn.Stat. § 473.621, subd. 1a (1984) and second, to respond to the governor's request for an explanation to the allegations. *See* Minn.Stat. § 473.141, subd. 5 (1984). Both of respondents' submissions were thus absolutely privileged communications and neither Glumack nor the Commission can be held liable for any defamatory matter therein. *See Freier*, 356 N.W.2d at 729.

Further, upon written charges of malfeasance, a commissioner may be removed from office by the governor if the commissioner first has an opportunity to be heard in the defense of the charges. *See* Minn. Stat. § 473.605, subd. 3 (1984). McGaa's letter clearly charged Glumack with malfeasant acts and Glumack and the Commission had a statutory right to respond. *Id.*

In sum, the alleged communication by Glumack of the memorandum was made in his capacity as a high-level official in state government and thus was absolutely privileged. The Commission's dissemination of the memorandum was also absolutely privileged, because it was done pursuant to a public duty to report to the legislature and governor.

As summary judgment was proper on grounds of privilege, we do not consider the damages question. McGaa's claim for tortious interference with contract against Glumack, concededly based solely on events in 1981, was also time-barred. Where a tortious interference claim is essentially part of a cause of action for defamation, *see* Minn.Stat. § 541.07, a two-year statute of limitations applies. *Wild*, 302 Minn. at 447, 234 N.W.2d at 793. McGaa's claim that Glumack made "working conditions so difficult * * *" did not separately and fully allege the existence of an underlying contract or a tort independent of defamation to allow the application of a six-year statute of limitations.

Finally, the submission of the 1981 memorandum to the governor and senator did not violate the MGDPA since it contained personnel data collected because McGaa was an employee of a statewide system. *See* Minn.Stat. § 13.43, subd. 1 (1984). This personnel data also appears to be public data, as it indicates the "status of any complaints or charges against the employee * * *." *Id.* at subd. 2.

Even if the memorandum constitutes nonpublic data, it was submitted pursuant to a legislative reporting duty and thus was "necessary for the administration and management" of the Commission under the MGDPA. *See* Minn.Stat. § 13.05, subd. 3 (1984). The MGDPA allows inter-govern-

mental access to nonpublic data "when the access is authorized or required by statute or federal law." Minn.Stat. § 13.05, subd. 9 (1984). All respondents' communications to the governor and senator were authorized by statute. Hence, no violation of the MGDPA occurred.

In addition, the submission was an absolutely privileged communication. In Minnesota, one "cannot elude the absolute privilege by relabeling a claim that sounds in defamation." *Pinto v. Internationale Set, Inc.*, 650 F.Supp. 306, 309 (D. Minn. 1986) (citing *Freier,* 356 N.W.2d at 733 and *Wild,* 302 Minn. at 447, 234 N.W.2d at 793).

## DECISION

Affirmed.