ANDERSON, Justice
(concurring in part, dissenting in part).
I join in Part I of the court’s opinion regarding the Minnesota Government Data Practices Act. I also agree with the court’s conclusion in Part II of its opinion that David Proffitt is not entitled to absolute privilege, and the court’s corollary decision to remand the case for the court of appeals to determine whether a qualified privilege shields Proffitt from liability in this case. I do not agree, however, with the court’s decision to provide Deputy Commissioner Anne Barry with an absolute privilege. The court’s opinion represents a significant and unprecedented extension of absolute privilege. Because I see no reason, and this dispute offers none, to change the boundaries of absolute privilege, I respectfully dissent.
I.
This case arises from a 2011 incident at the Minnesota Security Hospital in St. Peter (“MSH” or “the hospital”) and ensuing events. MSH is a Minnesota Department of Human Services (DHS) facility and the Commissioner of DHS is ultimately responsible for the hospital's operations. Appellant Dr. Michael Harlow is a board-certified psychiatrist who, in 2011, worked at MSH. During all relevant times, respondent David Proffitt was the hospital administrator at MSH and respondent Anne Barry was a Deputy Commissioner of DHS.
On November 15, 2011, a patient became violent and was placed in a “seclusion room.” Harlow was notified of the situation and ordered a number of measures, including the use of restraints, removal of the patient’s personal effects, and a full weapons search of the room. Harlow’s employment was terminated following an internal investigation of the incident by MSH.
DHS’s Licensing Division also initiated an investigation into the incident, but did not publish a report on the matter until May 2012. On February 28, 2012, Proffitt and Barry were quoted in a Minnesota Public Radio (MPR) news report regarding the hospital’s licensing situation. See Madeleine Baran, State Facility for Mentally III Risks Losing License over Turmoil, Minnesota Public Radio News, Feb. 28, 2012, http://www.mprnews.org/story/ 2012/02/28/minnesota-security-hospital-tu *575 rmoil. Both Proffitt and Barry commented on Harlow’s termination, with Barry stating, “Harlow was feed because he inappropriately used restraints and seclusion.” Id.
In May 2012, the Licensing Division issued a report, finding that suspicions of maltreatment through abuse and neglect of a vulnerable adult patient by MSH and Harlow were “substantiated.” When Harlow challenged this finding, however, the Licensing Division issued a revised report, changing its conclusion and stating that the results regarding Harlow’s fault in the incident were “inconclusive.”
On June 8, 2012, an MPR report noted that the Licensing Division’s report “found the facility and Dr. Harlow violated licensing standards, but that the violations were not serious or recurring.” See Madeleine Baran, Investigation Shows Complexity of Caring for the State’s Most Violent and Mentally III Adults, Minnesota Public Radio News, June 8, 2012, http://www. mprnews.org/story/2012/06/08/inves tigation-finds-patientsuffered-mal treatment-at-minnesota-security-hospital. The MPR report stated that Barry “was surprised that the licensing division did not classify the violations as serious,” and quoted her as saying, “There are human' rights violations there.”
Harlow sued both Barry and Proffitt, alleging violations of the Minnesota Government Data Practices Act and a claim of defamation. Harlow’s defamation claim was based on the statements made by Proffitt and Barry in the February and June MPR reports and a February 2012 email sent by Proffitt to other DHS personnel. Respondents moved for summary judgment on the defamation claim, arguing that the doctrines of absolute or qualified privilege shielded them from liability in this case. The district court denied the motion, but the court of appeals reversed, concluding that both Barry and Proffitt were entitled to absolute privilege on the defamation claim. Harlow v. State Dep’t of Human Servs., 862 N.W.2d 704, 714-16 (Minn.App.2015).
II.
I agree with the court’s conclusion that Proffitt is not entitled to an absolute privilege. In my view, however, the court significantly and unnecessarily expands the doctrine of absolute privilege by extending an absolute privilege to Deputy Commissioner Barry in this case.
Whether a privilege exists is a question of law, which we review de novo. See Minke v. City of Minneapolis, 845 N.W.2d 179, 182 (Minn.2014). We have previously recognized two distinct privileges that may apply to government employees who make allegedly defamatory statements during the course of their duties. First, we have recognized “a qualified or conditional privilege [that] grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice.” Matthis v. Kennedy, 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954). Second, we have recognized an absolute privilege that shields the speaker from liability in all circumstances, even if the statements are made with malice. Id.
Absolute privilege for legislative officials is a common-law doctrine dating back to at least 1399, and it is enshrined in the Minnesota Constitution, which provides: “For any speech or debate in either house [members of the Legislature] shall not be questioned in any other place.” Minn. Const, art. IV, § 6; see Carradine v. State, 511 N.W.2d 733, 734-35 (Minn.1994) (citing Barr v. Mattep, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). Our case law also has provided absolute privilege to various judicial officers who make state *576 ments in the course of their duties.[1] Minke, 845 N.W.2d at 182.
Almost from our earliest days as a state, however, we have expressed' skepticism about providing absolute immunity to members of the executive branch. In Peterson v. Steenerson, we doubted “the propriety of making the rule universal, and extending [absolute privilege] to all public officers” and concluded that “the rule of absolute privilege should be confined to its present limited application.” 113 Minn. 87, 89-90, 129 N.W. 147, 148 (1910). Our stance on the extremely limited nature of absolute privilege has endured for more than a century. Simply put, “we only extend the absolute privilege to government officials when public policy weighs strongly in favor of such extension.” . Zutz v. Nelson, 788 N.W.2d 58, 66 (Minn.2010).
In-Johnson v. Dwkswager, we faced the question of whether absolute privilege was' available to the Commissioner of the Department of Humari Services, a cabinet-level executive official. 315 N.W.2d 215, 221 (Minn.1982). We evaluated the federal rule on absolute privilege, which applies absolute privilege to any statements made by a federal officer of any level in the course of his or her- duties. Id. at 220. We noted that, although the federal rule was well established, the. majority of states have only extended absolute privilege to legislators; judicial officers; the governor; and top cabinet-level executive officials. Id. (citing Restatement (Second) of Torts § 591 (1977)). But states have generally refused to extend absolute privilege to executive officials below the cabinet level. Id.
' Although we declined to adopt the federal rule with respect to all members of the executive branch, we held that absolute privilege shields statements by the governor and cabinet-level officials. Dirkswager, 315 N.W.2d at 220-21. In providing absolute privilege to the governor and cabinet-level officials, we reasoned that “government can best be held accountable by assuring that its top-level representatives have no excuse not to speak out in the performance of their duties.” Id. at 221. In other words, when it comes to cabinet-level officials, the public is. a more reliable source of accountability than defamation law.
But we have consistently rejected attempts to expand absolute immunity beyond these limits. In Zutz, for instance, we declined to extend absolute privilege to an unelected watershed board. 788 N.W.2d at 60. In doing so, we emphasized that, unlike cabinet-level officials, there was insufficient accountability to justify an absolute privilege for unelected watershed board members: “Because there is no direct accountability to the voters for watershed district board members ..'. public criticism is the only vehicle for holding board members accountable. But this fact supports a qualified rather than absolute privilege....” Id. at 64.
Carradine v. State, 511 N.W.2d 733 (Minn.1994), is the only decision in which we have provided absolute privilege to an executive officer below the cabinet level. In Carradine, we held that absolute privilege applied to' statements made by a state trooper in a police report. Id. at 736-37. In doing so, we highlighted the special importance police reports play in the judicial process, tying the facts of Carradine to our prior precedent regarding absolute privilege in judicial proceedings. Id. at 736. At the same time, however, we declined to apply absolute privilege to statements made by the same state trooper *577 regarding the same incident when those statements were made in response to press inquiries. Id. at 737. We emphasized that the trooper was permitted, but not required, to respond to press inquiries and, as a result, concluded that public policy did not weigh in favor of providing the trooper with absolute privilege for those statements.[2] Id.
In short, our precedent clearly delineates the boundaries of absolute privilege. It also makes clear that the doctrine should be "confined within narrow limits.” Matthis, 243 Minn. at 223, 67 N.W.2d at 417. Significantly, when we have extended absolute privilege to executive officials, we have focused either on the interrelatedness of the duties of those officials and the judicial process, see Carradine, 511 N.W.2d at 736, or we have concluded that the ability of the public to hold. cabinet-level officials accountable through the political process was sufficient to prevent abuse of the privilege, see Dirkswager, 315 N.W.2d at 221.
Yet today, the court extends absolute privilege. to an executive official whose duties are not interrelated with the judicial process and who is not accountable to the public. In justifying its decision, the court relies almost exclusively on the fact that Deputy Commissioner Barry had “all the powers and authority of the commissioner unless the commissioner directs otherwise.” Minn.Stat. § 15.06, subd. 7 (2014). The court places particular weight on the fact that, as a Deputy Commissioner, Barry was empowered to “speak for the commissioner within and without the department or agency,” unless the Commissioner directed otherwise. Id.
There are serious'problems with "the court’s reasoning. First, the court erroneously concludes that Barry is a “cabinet-level official.” This is simply not the case. Although Barry held the title' of Deputy Commissioner, she did not head a department and her rank was not the'“‘equivalent of cabinet rank in the Federal Government.’” See Dirkswager, 315 N.W.2d at 220 (quoting Restatement (Second)' of Torts § 591 emt; c (Am. Law Inst.i977)). Tellingly, the court fails to identify any member of the federal cabinet to whom Barry should be compared,[3]
The fact that Barry had the authority to act and speak on behalf of the Commissioner does not make her a “cabinet-level official.” The court jumps from the fact that Deputy Commissioners have the same default powers as Commissioners to the conclusion that the rank of the positions must be the same. But the concepts of power and rank are distinct. The court’s reasoning ignores the reality that whether a position is “cabinet level” is determined by the responsibilities and elements of a position beyond its specific powers. To begin, the court overlooks significant differences in the process for selecting Commissioners and Deputy Commissioners. When we approved absolute privilege for cabinet-level officials in Dirkswager, our decision relied heavily on the fact that cabinet-level officials are best held accountable through the political process. 315 N.W.2d at 221. We reiterated the *578 importance of accountability when we declined to provide absolute privilege to an unelected watershed board in Zutz, 788 N.W.2d at 65.
Despite this emphasis on accountability, the court’s opinion barely acknowledges the significantly different processes through which Commissioners and Deputy Commissioners are selected. The Commissioner of DHS, who is shielded by absolute privilege, must be nominated by .the governor and approved by the senate. Minn.Stat. §§ 15.06, subd. 2, 245.03, subd. 1 (2014). Thereafter, a Commissioner serves “at the pleasure of the [governor].” Minn.Stat. § 15.06, subd. 2. Deputy Commissioners of DHS, however, are appointed by the Commissioner alone and serve at the pleasure of the Commissioner alone. Minn.Stat. §§ 15.06, subd. 7, 245.03, subd. 1.
The contrast in the level of accountability between Commissioners and Deputy Commissioners is striking and has profound implications for the effectiveness of the political process in holding Commissioners and Deputy Commissioners accountable. The Commissioner is selected by the democratically elected governor, must be confirmed by the democratically elected senate, and serves at the pleasure of the governor. Deputy Commissioners, on the other hand, are appointed by an unelected Commissioner and are accountable only to the unelected Commissioner. Far from being accountable to the people through the political process, Deputy Commissioner Barry is a bureaucrat who is substantially insulated from the accountability provided by the political process.
Without the underpinnings of accountability that were present in Dirkswager, the court’s decision to extend absolute privilege to statements by government officials below the cabinet level is both troubling and potentially expansive. It is worth emphasizing that the powers of the Deputy Commissioner can be altered unilaterally and at any time by the Commissioner. See Minn.Stat. § 15.06, subd. 7 (stating that “[t]he deputy commissioner shall have all the powers and authority of the commissioner unless the commissioner directs otherwise.... ”). The court does not address whether a Deputy Commissioner would still be entitled to absolute privilege if the Deputy Commissioner had some, but not all, of the powers of a Commissioner. These ambiguous determinations are exactly why the bright line of “cabinet-level officials” should not be blurred to include “almost-cabinet-level officials.”
This line is blurred even further by Minn.Stat. § 15.06, subd. 6(1) (2014), which authorizes Commissioners “to delegate to any subordinate employee the exercise of specified statutory powers or dutiés as the commissioner may deem advisable, subject to the commissioner’s control.”[4] Although the court notes that Deputy Commissioner Barry had “all the powers and authority of the commissioner,” its decision to extend absolute privilege to officials below the cabinet level based on the official’s powers and responsibilities opens the door to further expansion of the doctrine. This raises the question of where to draw the line. Does absolute privilege attach when an official, Deputy Commissioner or otherwise, has 70 percent of the Commissioner’s power? Ninety percent? We do not know. What we do know is' that it would be unnecessary to draw any additional *579 lines if the doctrine of absolute privilege remained confined to cabinet-level officials.
If an official’s access to absolute privilege turns on how many of the Commissioner’s powers that official holds, the court’s reasoning could be employed to provide absolute privilege to an unknown and undefined group of government officials. Indeed, the most troubling aspect of the court’s opinion is that it lays the groundwork for vesting the scope of absolute privilege in unelected Commissioners rather than our court; those Commissioners may soon be able t.o provide the shield of absolute privilege to their subordinates with the stroke of a. pen.
More importantly, the court’s opinion fails to explain why absolute privilege is even necessary in this case. The court simply reasons that, because the Commissioner of DHS is entitled to absolute privilege, a Deputy Commissioner authorized to speak on behalf of the Commissioner must be entitled to the same privilege. But, as discussed above, there are significant differences between the position of a Commissioner and a Deputy Commissioner — and there is an even greater difference between a Commissioner and a midlevel bureaucrat to whom the Commissioner has delegated some portion of the Commissioner’s power. The court provides no overriding policy concern necessitating - the application of absolute privilege to statements made by Deputy Commissioner’s or anyone else authorized to speak for the Commissioner.[5]
Barry is simply not a “cabinet-level official” and, thus, she is not entitled to absolute privilege under any of our precedents. Given, that “we only extend the absolute privilege to government officials when public policy weighs strongly in favor of such extension,” Zutz, 788 N.W.2d at 66 (emphasis added), the absence of a compelling policy interest weighing in favor of extending absolute privilege in this ease-is noteworthy. It certainly can be argued-that the statements at issue here related to a matter of public concern. But there is no reason that the Commissioner of DHS could not have made the statements directly if the Commissioner felt that an absolute, privilege was necessary to facilitate comment by the agency. There is no evidence that the public would have been deprived of key information or frank comment by the agency if an absolute privilege was available to the Commissioner alone, and not to Deputy Commissioner Barry.[6]
In short, it appears that'the court’s opinion in this case rests almost entirely on its conclusion that Barry’s powers as Deputy Commissioner must mean that Barry is entitled to; absolute privilege, under Dirk-swager. This erroneous conclusion ignores the underpinnings and rationale of Dirkswager and Zutz. The court’s decision to extend absolute privilege to an unelected and unaccountable bureaucrat in a case in which there is no overriding policy need conflicts with our jurisprudence and creates the real possibility that the absolute privilege doctrine has escaped the “narrow confines” in which we sought to contain it.
III.
I do not mean to suggest that Barry should not be entitled to any protection for statements made during the course of her *580 official duties. Indeed, Barry may have a qualified privilege here. But the extension of- absolute privilege — the only question before our court — is a serious matter. As we have recognized, the extension of absolute privilege comes at a cost, “The effect of absolute privilege is to immunize ... defamatory speech, speech that can be personally crushing and career-ending.” Zuts, 788 N.W.2d at 64.
Simply put, the unavoidable consequence of expanding any privilege or immunity is that some claims, perhaps even the most meritorious claims, will go uncompensated. In this case, the expansion of absolute privilege — and the corollary denial of meritorious claims — is not justified. As a result, I would remand this case to the court of appeals to determine whether a qualified privilege applies to the statements by Barry and Proffitt.

. This is also consistent'with the English common law, which extended absolute privilege to judicial officers as early as the sixteenth century, See Carradine, 511 N.W,2d at 735,

. We have also declined to provide absolute privilege to law enforcement officers when they make statements about applicants to prospective employers, Minke, 845 N.W.2d at 183, further buttressing the conclusion that Carradine is the very rare exception to the rule that lower-level executive officials are not entitled to absolute privilege.

. The fact that a Deputy Commissioner position is not the state equivalent of a federal cabinet position should be self-evident. No “Under Secretary of State" or "Under Secretary of Defense” would be taken seriously if he or she attempted to characterize the post as “cabinet level.”

. The only limitations on this power are "that every delegation shall be made by written order, filed with the secretary of state; and further provided that only a deputy commissioner may have all the powers or duties of the commissioner." Minn.Stat. § 15.06, subd. 6(1).

. More often, a chief of staff or a communications officer is authorized to speak on behalf of a Commissioner.

. Indeed, Barry made these comments in a legal environment in which it was far from certain that Barry had access to an absolute privilege. The court’s post hoc extension of that privilege to Barry’s circumstances can hardly be judged to have played a significant role in Barry’s decision to speak.