**Loren J. ZUTZ, et al., Appellants,**

v.

**John NELSON, et al., Respondents.**

No. A08–1764.

Supreme Court of Minnesota.

Sept. 9, 2010.

---

Paul A. Sortland, Sortland Law Office, Minneapolis, MN, for appellants.

Lindsay G. Arthur, Jr., Beth Jenson Prouty, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, MN, for respondents.

## OPINION

ANDERSON, G. BARRY, Justice.

This case involves the level of privilege from defamation liability applicable to subordinate government bodies such as water-

shed district boards. All four parties are board members of the Middle Snake Tamarac Rivers Watershed District in northwestern Minnesota. While serving as board members, Loren J. Zutz and Elden J. Elseth conducted an investigation regarding alleged improprieties in the watershed district's payroll practices. Fellow board members John Nelson and Arlyn Stroble believed that the actions of Zutz and Elseth were inappropriate and in violation of the law. Both Nelson and Stroble allegedly made statements to that effect at a 2007 watershed district meeting, and Zutz and Elseth then brought this action against Nelson and Stroble for defamation. The Marshall County District Court granted Nelson and Stroble's motion for judgment on the pleadings, holding that as board members, they were protected by an absolute legislative privilege. Zutz and Elseth appealed, and the court of appeals affirmed in an unpublished decision. *Zutz v. Nelson*, No. A08–1764, 2009 WL 1752139 (Minn.App. June 23, 2009). Because we hold that members of watershed district boards are entitled to only a qualified, rather than an absolute, privilege, we reverse and remand.

A watershed district is a special-purpose unit of local government created by statute "[t]o conserve the natural resources of the state by land use planning, flood control, and other conservation projects." Minn. Stat. § 103D.201, subd. 1 (2008). Watershed districts are established for various specific purposes serving those ultimate goals, including controlling flood waters, diverting watercourses, providing and conserving water supply, regulating the use of ditches and watercourses, regulating improvements by riparian property owners, and providing hydroelectric power, among others. Minn.Stat. § 103D.201, subd. 2 (2008). Watershed districts have extensive authority at their disposal in order to accomplish these goals. For example, districts may acquire dams, dikes, reservoirs, water supply systems, and real and personal property by exercising the power of eminent domain or by other means. Minn. Stat. § 103D.335, subds. 1(3), 9, 11 (2008).

Each watershed district in Minnesota is operated by a board of managers. The county commissioners of the counties served by the watershed district appoint the managers, who serve three-year terms. Minn.Stat. §§ 103D.311, subd. 2, 103D.315, subd. 6 (2008). Board members of watershed districts take an oath that applies to Executive Department officers, Minn.Stat. § 103D.315, subd. 1 (2008), but also act in a quasi-legislative capacity. The Middle Snake Tamarac Rivers Watershed District's board has seven members, six of whom are appointed by the Marshall County commissioners. The seventh member is appointed by the Polk County commissioners.

The Middle Snake Tamarac Rivers Watershed District is one of 45 watershed districts in Minnesota. The district is located in northwestern Minnesota, primarily in Marshall County, and covers the natural watershed areas of the Middle, Snake, and Tamarac Rivers. All three rivers are tributaries of the Red River.

Watershed district boards hire employees to facilitate "the works and improvements undertaken by the district." Minn. Stat. § 103D.325, subd. 3 (2008). In the course of their activities as members of the district's board, plaintiffs Zutz and Elseth became concerned about payments to various district employees. They made inquiries at the district's bank, and obtained certain bank records in response to their inquiries.

At a district board meeting on June 18, 2007, two other board members, defendants Nelson and Stroble, allegedly accused Zutz and Elseth of violating the

Minnesota Government Data Practices Act by making inquiries and obtaining the records from the bank. Specifically, in response to a question about whether Zutz and Elseth violated the Minnesota Government Data Practices Act, Zutz and Elseth allege that Nelson stated: "I don't think there is much question that he did."[1] Nelson also allegedly said, "Laws are being broken by Board Members—enough is enough!" The implication of that statement was allegedly that Zutz and Elseth had violated Minnesota law. Zutz and Elseth also allege that at the same meeting, Stroble said, "Why should we provide legal counsel for actions that are against the law?" implying that Zutz and Elseth had engaged in unlawful activities.

Zutz and Elseth brought an action against Nelson and Stroble for defamation. Nelson and Stroble raised several affirmative defenses and moved for judgment on the pleadings. The district court granted the motion and dismissed the complaint on the ground that an absolute legislative privilege protected Nelson and Stroble from defamation claims.

Zutz and Elseth appealed, arguing that Minnesota law does not extend absolute privilege to subordinate bodies such as watershed district boards. The court of appeals affirmed the district court's judgment in an unpublished opinion. *Zutz v. Nelson*, No. A08–1764, 2009 WL 1752139, at *2 (Minn.App. June 23, 2009). We granted review on one legal issue: whether the doctrine of absolute legislative privilege applies to allegedly defamatory statements made by members of a subordinate public body, such as the board of the Middle Snake Tamarac Rivers Watershed District.

■■■■ The district court granted Nelson and Stroble's motion for judgment on the pleadings under Minnesota Rule of Civil Procedure 12.03 and dismissed Zutz and Elseth's complaint. We have said that "[j]udgment on the pleadings is proper where the defendant relies on an affirmative defense or counterclaim which does not raise material issues of fact." *Jacobson v. Rauenhorst Corp.*, 301 Minn. 202, 206, 221 N.W.2d 703, 706 (1974), *overruled on other grounds by Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838 (Minn. 1979). On appeal from such a dismissal, we consider only the facts alleged in the complaint, accepting those facts as true and drawing all reasonable inferences in favor of the nonmoving party. *Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 45 (Minn.2009). We review de novo whether "the complaint sets forth a legally sufficient claim for relief." *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn.2003).

■■■■ Two categories of privilege exist as defenses against defamation claims—absolute privilege and conditional or "qualified" privilege. Both types of privilege are broadly recognized across the United States, and generally "result[ ] from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 889 (Minn. 1986). The Restatement (Second) of Torts explains that absolute and qualified privileges are both "based upon a policy that treats the ends to be gained by permitting defamatory statements as outweighing the harm that may be done to the reputation

---

**1.** The complaint states that "he" in this statement by Nelson referred to both Zutz and Elseth.

of others." Restatement (Second) of Torts ch. 25, topic 2, tit. B Introductory Note, at 242–43 (1977). Absolute and qualified privileges cover statements made by many categories of public officials, and have the purpose of making officials "as free as possible from fear that their actions in [their] position[s] might" subject them to lawsuits for defamation. *Id.* at 243. An absolute privilege applies without regard to the intent of the speaker, but a qualified privilege requires a determination of the speaker's mental state. We have defined the difference between the two kinds of privileges by stating that "[a]bsolute privilege means that immunity is given even for intentionally false statements, coupled with malice, while a qualified or conditional privilege grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice." *Matthis v. Kennedy,* 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954).

■ Nelson and Stroble argue that their alleged statements should be covered by absolute legislative privilege. Zutz and Elseth assert that Nelson and Stroble may claim the benefit of only a qualified privilege, and therefore may avoid liability for defamatory statements only by showing their good faith and lack of malice. *See Matthis,* 243 Minn. at 223, 67 N.W.2d at 416.

■ Absolute privilege is not lightly granted and applies only in limited circumstances. The Minnesota Constitution grants absolute privilege from defamation liability to members of the State Senate and House of Representatives in the discharge of their official duties. Minn. Const. art. IV, § 10. We have extended this absolute privilege, as a matter of public policy, to some other government officials in certain contexts. *E.g., Bauer v. State,* 511 N.W.2d 447, 450 (Minn.1994) (acknowledging the extension of absolute privilege to government officials acting in judicial or quasi-judicial capacities); *Johnson v. Dirkswager,* 315 N.W.2d 215, 223 (Minn.1982) (extending absolute privilege to Commissioner of Public Welfare in the performance of his official duties as a "top-level cabinet-type" official). But we have consistently declined to extend absolute privilege to all government officials. *E.g., Bauer,* 511 N.W.2d at 450 (declining to extend absolute privilege to mid-level state employees acting in their official capacities); *Jones v. Monico,* 276 Minn. 371, 375, 150 N.W.2d 213, 215–16 (Minn.1967) (declining to extend absolute privilege to a member of a county board). While our jurisprudence on the extension of the absolute privilege has not been a model of clarity, our precedent most relevant to the present dispute points us to qualified rather than absolute privilege.

We have declined to extend absolute privilege from defamation liability to members of subordinate elected government bodies such as city councils and county boards. In *Burch v. Bernard,* we declined to extend absolute privilege to a city council member who, pursuant to business before an ongoing city council meeting, accused a nurse employed by the city of "running nothing but a damn whorehouse." 107 Minn. 210, 211, 120 N.W. 33, 33 (1909). We analyzed the issue under a qualified privilege standard, stating that for the privilege to apply a city council member must make the challenged statement " 'in good faith and in the honest belief that [it is] true.' " *Id.* at 212, 120 N.W. at 34 (quoting *Quinn v. Scott,* 22 Minn. 456, 462 (1876)). In *Jones v. Monico,* we reasserted our holding in *Burch* by declining to extend the absolute privilege to members of a county board accused of making defamatory statements during board proceedings. 276 Minn. 371, 375–76, 150 N.W.2d 213, 216 (1967). We flatly con-

cluded that "subordinate bodies, including municipal councils or town meetings, are not within the policy underlying absolute immunity since the members of such bodies are sufficiently protected by exemption from liability in the exercise of good faith." *Id.* at 375, 150 N.W.2d at 216. In other words, we held that a qualified, not absolute, privilege from defamation liability applies to subordinate bodies such as city councils or county boards.[2]

■■ We are "extremely reluctant to overrule our precedent under principles of *stare decisis*" and "require a compelling reason" to do so. *State v. Martin,* 773 N.W.2d 89, 98 (Minn.2009) (citation omitted) (internal quotation marks omitted). While we are mindful that *stare decisis* "does not bind [our court] to unsound principles," *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 406 (Minn.2000), the reasoning underlying the holdings in *Burch* and *Jones* is not unsound, and there is no compelling reason to overturn those cases.

Given our refusal to extend an absolute privilege to elected city councils or county boards, we see no reason to extend absolute privilege to appointed watershed district boards. Thus, in keeping with our holdings in *Burch* and *Jones,* we decline to extend absolute privilege here.

But we need not here decide the issue of whether to extend an absolute privilege to city councils and county boards. We can decide this case on the much more limited issue of whether to grant absolute privilege to an unelected and even more subordinate government body—a watershed district board. That consideration extends to closely examining the public costs and benefits of expanding the doctrine of absolute immunity from defamation liability within the confines of the case before us.

■ "The doctrine of privileged communication rests in that of public policy." *Matthis v. Kennedy,* 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954). "It is peculiarly so in the case of absolute privilege, for in the case of a communication recognized as absolutely privileged even the presence of express malice does not destroy the privilege." *Id.* at 223, 67 N.W.2d at 417. Thus, we should keep the doctrine of absolute privilege "confined within narrow limits." *Id.* at 223, 67 N.W.2d at 417. The duty before our court, therefore, is to determine whether the public is best served by allowing the unelected members of a watershed district board protection from defamation liability even when they defame with malice. We conclude that limiting watershed district board members to a qualified privilege better serves the people of Minnesota.

Proponents of extending the absolute privilege to watershed district boards, including the dissent, make essentially three arguments for the absolute privilege.[3]

2. We have also said, in dicta, citing a Massachusetts case and a now-antiquated legal treatise, that the "rule of general application in this country that libelous or slanderous matter published in the due course of ... legislative proceedings is absolutely privileged" applies to "all legislative bodies, state or municipal." *Peterson v. Steenerson,* 113 Minn. 87, 89, 129 N.W. 147, 147–48 (1910). And in *Jones,* we created confusion by quoting the *Peterson* dicta. *Jones,* 276 Minn. at 374–75, 150 N.W.2d at 215–16. But we have not applied the *Peterson* dicta in later cases and have consistently applied qualified rather than absolute privilege to subordinate elected bodies such as city councils and county boards.

3. The dissent also bases its position on a "diverse collection of authorities" that it asserts represents the "modern rule." All but one of the sources cited by the dissent, however, address the extension of the absolute privilege to duly elected city and county legislative bodies, which is not at issue in the case before us. Further, it is only the soundness of the reasoning underlying the sources that should

Proponents argue: (1) without the protection of the absolute privilege, fewer Minnesotans will volunteer for service on watershed district boards or similar civic posts; (2) without the protection of the absolute privilege, members of watershed district boards will be reticent to share important information at board meetings for fear of being sued for defamation; and (3) there is no reason why we should grant the absolute privilege for higher ranking government officials and not for lower ranking officials such as members of watershed district boards. These arguments are unconvincing.

We address the first and second arguments together as they are related. The dissent asserts the importance of watershed district boards, and stresses that these boards have extensive authority at their disposal in order to accomplish their goal of managing watersheds. We agree that watershed districts have substantial authority, including the power of eminent domain. We disagree, however, that extensive authority leads inexorably to an extension of absolute privilege. The dissent admits that we have never extended absolute privilege in Minnesota to subordinate bodies such as watershed district boards.[4] Indeed the parties do not offer any evidence that since *Burch v. Bernard,* 107 Minn. 210, 120 N.W. 33 (1909), decided a century ago, Minnesota citizens have been unwilling to serve on city councils because council members receive only qualified as opposed to absolute privilege. Given this fact, it is not surprising that the

dissent simply asserts, without proof, that absolute privilege is necessary to encourage volunteers to serve as members of *unelected* watershed district boards.

The dissent similarly asserts, without record evidence, that exposing members of watershed district boards to potential defamation claims will have a "chilling effect" that will not only result in an inability to attract qualified board members but that will also prevent those members who do volunteer from having candid deliberations at board meetings. Neither the parties to this case nor the dissent provides any evidence of a "chilling effect" associated with service on a board with a qualified privilege. We see no compelling need to extend the absolute privilege without any evidence that the qualified privilege is insufficient to protect members of watershed district boards.[5]

Moreover, extending the absolute privilege to watershed district boards would come at a cost and strike the wrong balance between the competing interests of the public. The effect of absolute privilege is to immunize board members who engage in defamatory speech, speech that can be personally crushing and career-ending. Watershed district board members are appointed by county boards. So, unlike the State Legislature, or even a city council or county board, citizens who dislike the actions of watershed district boards cannot vote these members out of office. Nor can citizens necessarily vote

concern us, not the perceived trend in those sources.

4. For instance, as the dissent notes, Minnesota was listed among jurisdictions not extending absolute privilege to subordinate legislative bodies in the Restatement (Second) of Torts. *See* 5 Restatement (Second) of Torts app. § 590, Reporter's Note cmt. c (1981).

5. The Legislature is, of course, free to extend the absolute privilege to the watershed district boards, which are a legislative creation. As a matter of public policy it is preferable that the Legislature determine whether an absolute privilege is needed to ensure the service of willing and qualified volunteers on these boards. To date, the Legislature has declined to extend absolute privilege to watershed district boards.

out of office those who *appointed* watershed district board members.[6]

Consider the example of a hypothetical watershed district facing an eminent domain issue which prompts a heated exchange between a citizen who does not want her property seized by the government and a district board member who wrongly impugns the character of the complaining citizen. It is one thing to say that the board member has a qualified privilege in connection with official district deliberations, and quite another to say that a district board member may attack the complaining citizen with express malice. A more persuasive argument can be made, perhaps, for extending absolute privilege to the deliberations of elected county and municipal bodies, in that the citizen damaged by the wrongful speech of the board member at least has the remedy of voting for someone else. But here, the watershed district board members are largely unaccountable to the public they serve. The dissent asserts that watershed district boards are susceptible to public scrutiny and criticism and are therefore accountable. Because there is no direct accountability to the voters for watershed district board members, we agree with the dissent that public criticism is the only vehicle for holding board members accountable. But this fact supports a qualified rather than absolute privilege, at least in the absence of proof of anything more than a theoretical problem. The damage from defamatory statements is real; public criticism of an unelected board member is hardly comparable.

■ Finally, the third argument proponents make for extending absolute privilege to watershed district boards is that there is no reason to draw a distinction between higher ranking legislative bodies and lower ranking bodies such as watershed district boards. The dissent supports this argument by reference to our decision in *Carradine v. State*, 511 N.W.2d 733 (Minn.1994). We disagree for two reasons. First, there is a reason to draw a distinction between elected and unelected bodies as discussed above. Additionally, the reasoning underlying this argument, taken to its logical conclusion, leads to absolute immunity for any and all appointed governmental boards, at least to the extent those boards have significant powers, and might very well extend to administrative employees serving in countless governmental bureaucracies. In the end, we conclude that judicial extension of the absolute privilege should occur only on the basis of sound evidence that a need exists.

Second, *Carradine* does not support the dissent's position. In *Carradine* we extended the absolute privilege from defamation liability to police officers for statements made in police reports. 511 N.W.2d at 736–37. We recognized that the public interest is served by extending the absolute privilege in some cases, but we did not simply announce a blanket rule that absolute privilege should extend to all government officials at all levels. Rather, we weighed the competing public policies relevant in that context and determined that, in the narrow case of a police officer's official report, the people of Minnesota are better served by extending the absolute

6. The Middle Snake Tamarac Rivers Watershed District, at issue in this case, has six members appointed by the Marshall County Board of Commissioners and one member appointed by the Polk County Board of Commissioners. If a resident of Polk County living within the Middle Snake Tamarac Rivers Watershed District took issue with the actions of members of the watershed district board appointed by Marshall County, that resident would not be able to vote against those who appointed the offending watershed district board members.

privilege. Indeed, in *Bauer v. State*, a case we decided contemporaneously with *Carradine*, we decided not to extend the absolute privilege to certain mid-level government employees. 511 N.W.2d 447, 450 (Minn.1994). We declined to extend the privilege because the specific facts and policy considerations in *Bauer* did "not raise public policy considerations of the same urgency as *Carradine*." *Id.* *Bauer* and *Carradine* both reassert the basic principle expressed in *Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954), that we only extend the absolute privilege to government officials when public policy weighs strongly in favor of such extension.

For the reasons discussed above, we conclude that the people of Minnesota are better served by the application of a qualified, rather than absolute, privilege to members of watershed district boards. We therefore reverse the district court and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

ANDERSON, PAUL H., J., dissenting.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., J., (dissenting).

I respectfully dissent. The majority relies on two of our older cases—one from 1909 and the other from 1967—in declining to extend absolute legislative privilege to statements made by watershed district board members in their official capacities. *Jones v. Monico*, 276 Minn. 371, 150 N.W.2d 213 (1967); *Burch v. Bernard*, 107 Minn. 210, 120 N.W. 33 (1909). Since we decided those cases, a contrary trend has emerged in several other jurisdictions, extending absolute privilege beyond a state's

highest legislative bodies. I find the authority supporting the modern trend highly persuasive. A thorough review of cases from our court and elsewhere, including the United States Supreme Court supports a change in the law in this area. Because I conclude that the qualified privilege provides insufficient protection for the public interest in free and open legislative debate, I dissent.

The extension of the absolute legislative privilege, which Minnesota's Constitution grants to members of the Legislature, to other contexts as a matter of policy has been " 'a story of uneven development.' " *Carradine v. State*, 511 N.W.2d 733, 734 (Minn.1994) (quoting *Barr v. Matteo*, 360 U.S. 564, 579, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (Warren, C.J., dissenting)). In an early case, we stated that "It is a rule of general application in this country that libelous or slanderous matter published in the due course of judicial or legislative proceedings is absolutely privileged. . . . The rule is broad and comprehensive, including within its scope . . . all legislative bodies, state or municipal." *Peterson v. Steenerson*, 113 Minn. 87, 89, 129 N.W. 147, 147–48 (1910) (citations omitted). This broad language in *Peterson* was dicta, however, because a member of a state or municipal legislative body did not make the statement at issue. Rather, in *Peterson* we addressed statements made by a postmaster regarding the misconduct of a mail carrier and held that only qualified privilege, and not absolute privilege, applied. *Id.* at 88, 90, 129 N.W. at 147, 148.

Our broad statement in *Peterson* regarding the scope of absolute legislative privilege was to a certain degree inconsistent with three of our earlier cases on this issue. In those earlier cases, we focused on the scope of the duties of the members of local legislative bodies, and held that their allegedly defamatory statements

were not absolutely privileged because the statements exceeded the scope of those duties. In *Wilcox v. Moore*, 69 Minn. 49, 50–51, 71 N.W. 917, 918 (1897), for example, a city council published a resolution in the local newspapers calling for the resignation of a local judge and describing the judge's alleged conduct as "highly unbecoming a man." The judge sued the city council, and we held on appeal that "the article [was] not privileged" because the city council members "went outside of the line of their official duty" in publishing it. *Id.* at 52, 71 N.W. at 919. In *Trebby v. Transcript Publishing Co.*, 74 Minn. 84, 88–89, 76 N.W. 961, 961–62 (1898), we similarly held that a city council resolution published in the local newspaper that characterized the plaintiff as a "disreputable person" was not "within the scope of official authority" and therefore was not absolutely privileged. Finally in *Burch*, 107 Minn. at 211–12, 120 N.W. at 33–34, where a city council member accused a nurse employed by the city of "running nothing but a damn whorehouse," we held that the statement was not absolutely privileged because it was not "made on a proper occasion" nor "pertinent to any inquiry or investigation pending before the council."

More than half a century later in *Jones*, 276 Minn. 371, 150 N.W.2d 213 (1967), we again addressed the issue of absolute legislative privilege for members of subordinate legislative bodies. The plaintiff in *Jones* charged members of a board of county commissioners with defamation of his personal and business reputation during board proceedings. *Id.* at 371–72, 150 N.W.2d at 214. Citing the language in *Peterson* applying absolute privilege broadly, we said that

> [s]tatements made in the course of legislative proceedings, including those made by members of municipal councils or other governing bodies of political subdivisions, are privileged. This privilege

applies if it relates to a matter within the scope of that particular body's authority.

*Jones*, 276 Minn. at 374, 150 N.W.2d at 215 (citing *Peterson*, 113 Minn. at 89, 129 N.W. at 147).

With no explanation of our reasoning, we abruptly shifted gears in *Jones* after making the foregoing broad statement about the general rule on absolute privilege and proceeded to articulate a much narrower holding. We held that "the proceedings of subordinate bodies, including municipal councils or town meetings, are not within the policy underlying absolute immunity since the members of such bodies are sufficiently protected" by the qualified or conditional privilege. *Id.* at 375, 150 N.W.2d at 216. In reaching this holding, we did not elaborate further regarding the policy underlying absolute privilege or the reasons for distinguishing subordinate legislative bodies from the State Legislature. The court of appeals has subsequently read *Jones* as placing Minnesota "among the jurisdictions applying [only a] conditional privilege" to subordinate legislative bodies. *Johnson v. Northside Residents Redevelopment Council*, 467 N.W.2d 826, 828 (Minn.App.1991), *rev. denied* (Minn. July 24, 1991).

In their analysis of the case before us, neither the district court nor the court of appeals cited *Jones* or discussed its reasons for reaching a result contrary to our holding in *Jones*. Both courts focused on our more recent cases dealing with absolute privilege in the executive branch. *See, e.g., Johnson v. Dirkswager*, 315 N.W.2d 215, 216 (1982) (extending absolute privilege to cover a top level cabinet-type official in the executive branch). In *Carradine v. State*, 511 N.W.2d 733, 736–37 (Minn.1994), the case upon which the court of appeals relied most heavily, we held that

police officers enjoy absolute privilege against defamation suits arising from the contents of their official arrest reports, but only a qualified privilege with respect to statements made to the news media. Adopting reasoning from the United States Supreme Court, we noted in *Carradine* that immunity:

> is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

*Id.* at 735 (quoting *Barr v. Matteo*, 360 U.S. 564, 572–73, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). Rejecting the high level/low level officer distinction, we went on to state in *Carradine* that the assignment of an absolute privilege to an executive official "depends on many factors, including the nature of the function assigned to the officer and the relationship of the statements to the performance of that function." *Carradine*, 511 N.W.2d at 736.

The court of appeals read *Carradine* as implicitly overruling *Jones*, although the court of appeals reached this result without citing or discussing *Jones* itself. *Zutz v. Nelson*, No. A08–1764, 2009 WL 1752139, at *1 (Minn.App. June 23, 2009). Rather, the court of appeals discussed *Johnson v. Northside Residents Redevelopment Council*, 467 N.W.2d 826, 828 (Minn.App.1991) *rev. denied* (Minn. July 24, 1991), a case that followed the bright-line rule we articulated in *Jones*. The court stated that:

Although the *Johnson* court indicated that proceedings of municipal councils and other subordinate bodies are not within the policy underlying absolute immunity, the Minnesota Supreme Court has since held [in *Carradine*] that absolute immunity is not determined by the individual's "rank in the executive hierarchy," but rather is dependent on the "nature of the function assigned to the officer and the relationship of the statements to the performance of that function."

*Zutz*, 2009 WL 1752139, at *1 (citation omitted) (quoting *Carradine*, 511 N.W.2d at 735–36) (internal citation omitted). We therefore now face the decision of whether to explicitly extend *Carradine*'s reasoning to lower level officials in the legislative context, overruling *Jones* in the process, or to instead reaffirm the rule articulated in *Jones*, and hold that members of subordinate legislative bodies are entitled to only a qualified privilege. The majority chooses the latter course, and in my view, strikes the wrong balance between the interest of the public in open legislative debate and the interests of private citizens seeking recourse for defamation.

Although we are not bound by Restatement positions, we nonetheless view them as useful persuasive authority that can sometimes prove helpful in our analysis. *See, e.g., Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 332 (Minn. 2000) (describing section 611 of Restatement (Second) of Torts as "persuasive"). Here, I find the relevant Restatement provisions to be a useful starting point for my analysis. The first Restatement of Torts grants absolute privilege to members of only "the highest legislative body of a State." Restatement of Torts § 590 cmt. c (1938). That rule reflects the majority rule of its era, but today represents a

minority position.[1] The second Restatement extends the privilege by providing that "[a] member of the Congress of the United States or of a State *or local* legislative body is absolutely privileged to publish defamatory matter concerning another in the performance of his legislative functions." Restatement (Second) of Torts § 590 (1977) (emphasis added).

Our prior cases together with subsequent developments in the law, including the second Restatement, place us at a fork in the road with respect to the question of what Minnesota's law regarding absolute legislative privilege should be. We must decide whether to retain the historic rule reflected in *Jones,* 276 Minn. at 375, 150 N.W.2d at 216, and the first Restatement, or to abandon that rule and join other states that have adopted the modern majority position of the second Restatement. Upon reviewing the two alternatives and the cases analyzing them, I ultimately conclude that the modern rule, applying the absolute legislative privilege more broadly, is the better rule. I will proceed to review and compare the relevant cases that lead me to this result.

1. Counting jurisdictions to determine which rule is the majority and which is the minority is difficult because many states, like Minnesota, have inconsistent authority on the question. According to M.O. Regensteiner, Annotation, *Libel and Slander: Statements or Utterances by Member of Municipal Council, or of Governing Body of Other Political Subdivision, in Course of Official Proceedings, as Privileged,* 40 A.L.R.2d 941, 943 (1955), *Mills v. Denny,* 245 Iowa 584, 63 N.W.2d 222 (1954), is the only decision that "expressly" holds that members of subordinate legislative bodies are entitled to only a conditional privilege. Several other states, however, also have authority expressing this position. *See* 5 Restatement (Second) of Torts app. § 590 Reporter's Note, cmt. c (1981) (listing cases from states including Delaware, Maine, and Minnesota).

The Iowa Supreme Court's 1954 case *Mills v. Denny,* 245 Iowa 584, 63 N.W.2d 222 (1954); provides the only thorough articulation I have found of the reasoning supporting the traditional rule. In *Mills,* a mayor allegedly defamed the plaintiff, a local attorney, during a city council meeting. *Id.* at 223–24. The Iowa court explained its decision that "the utterances or publications of members of a city council are not included" in the absolute[ ] privilege *id.* at 227, by stating:

> Absolute immunity, it seems, should be confined to cases where there is supervision and control by other authorities, such as courts of justice, where ... a learned judge ... may reprimand, fine and punish as well as expunge from records statements of those who exceed proper bounds.... The same is true in federal and state legislatures, and their committees, where the decorum is under the watchful eye of presiding officers and records may be stricken and the offending member punished.

*Id.* at 225; *see also Hawkins v. Harris,* 141 N.J. 207, 661 A.2d 284, 291 (1995) (employing the same type of analysis).

The American Law Reports article states, and the cases cited in the note to the Second Restatement confirm that, in the majority of the comparatively few cases to consider the issue, courts "have held or recognized that at least under some circumstances members of governing bodies of political subdivisions are entitled to the complete defense afforded by [absolute] privilege, for utterances made by them during the course of official proceedings." Regensteiner at 943. Jurisdictions that have expressly adopted the modern rule include Oregon, Arizona, Michigan, New Hampshire, Florida, and (by statute) Kentucky and Utah. *See* Restatement (Second) of Torts app. § 590 Reporter's Note, cmt. c. (1981—also citing supplement(s)).

The Iowa court went on to predict that without such "supervision and control," courts might eventually cease to "recognize and grant absolute immunity" even within courts and the highest legislative bodies of a state, because "the evil [of unredressable defamation might] overshadow the good and [thus] not aid the public welfare." *Mills*, 63 N.W.2d at 225. In addition, the court expressed a view that "only top officers or executives whose acts are of necessity secret or confidential fall within [absolute] immunity." *Id.* But see *Carradine*, 511 N.W.2d at 736 (extending absolute privilege to lower level executive officers under some circumstances in Minnesota).

The Iowa court in *Mills* also relied on the first Restatement of Torts and other secondary authorities of its era that granted absolute privilege to only " 'the highest legislative body of a State.' " 63 N.W.2d at 226 (quoting Restatement of Torts § 590 cmt. c (1938)). The court thus followed what was at the time the holding of "the majority of the courts in other jurisdictions." *Id.* at 227. A decade later in a case involving defamation of one city council member by another, Delaware's Superior Court followed the rule of *Mills* and the first Restatement even while acknowledging "persuasive public policy reasons for making absolutely privileged" the statements of municipal legislators. *McClendon v. Coverdale*, 203 A.2d 815, 817 (Del.Super.Ct.1964).

The Iowa Supreme Court's reasoning, limiting absolute privilege to the courts and the highest legislative bodies of a state where the "controlling influence of [the] learned judge" and general prevailing "decorum" might protect plaintiffs' reputation interests, has not prevailed in the modern era. *Mills*, 63 N.W.2d at 225. *Commentators* criticize reasoning analogous to that in *Mills* because of the unlikelihood that defamatory statements in courts or Congress are in fact stricken from the record or controlled via censure. *E.g.*, 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 8.2 (3d ed.2009). Several more recent cases from other states contain persuasive explanations of why absolute privilege should be extended to members of legislative bodies beyond a state's highest bodies. These cases grapple with the core policy dilemma underlying absolute legislative privilege— the appropriate balance between the public interest in free exchange of information during the legislative process and the individual rights of people who might be defamed by unscrupulous participants in that process. A growing number of courts have ultimately come out in favor of affording absolute privilege to members of local legislative bodies.[2]

In *Noble v. Ternyik*, 273 Or. 39, 539 P.2d 658, 659–61 (1975), for example, the Oregon Supreme Court addressed a lawsuit against a port commission[3] member who allegedly falsely accused the plaintiff of theft during a commission meeting. The Oregon court discussed the shift in

---

**2.** *E.g., Sanchez v. Coxon*, 175 Ariz. 93, 854 P.2d 126, 130 (1993); *Voelbel v. Town of Bridgewater*, 144 N.H. 599, 747 A.2d 252, 253 (1999); *Bd. of Educ. v. Buffalo Council*, 52 A.D.2d 220, 383 N.Y.S.2d 732 (1976); *Costanzo v. Gaul*, 62 Ohio St.2d 106, 403 N.E.2d 979 (1980); *Noble v. Ternyik*, 273 Or. 39, 539 P.2d 658 (1975).

**3.** An Oregon port commission, like a Minnesota watershed district, is a public body created by statute for the purpose of managing water resources. *Noble*, 539 P.2d at 660; Or.Rev.Stat. § 777.010. Port commissions "exercise a great variety of governmental power, including the levying of taxes and the acquiring of property." *Noble*, 539 P.2d at 660. Port commission board members are elected. Or.Rev.Stat. § 777.135; 777.160.

the Restatement rule and "reached the conclusion . . . that [the modern rule was] preferable." *Id.* at 661. The court noted that "[u]ncompensated citizens, serving at least in part to fulfill their civic responsibility, comprise the vast bulk" of members of "[p]ort commissions, city councils, school boards, and special service districts. . . ." *Id.* The court reasoned that "[t]his system will function only if capable people are willing to serve on these bodies," and many individuals would be deterred from service entirely or be "hesitant to bring information to the attention of their legislative bodies" if they were protected by only a conditional privilege. *Id.*

The Oregon court in *Noble,* like many other courts addressing absolute privilege, found support in an argument advanced more than sixty years ago by Judge Learned Hand of the Second Circuit Court of Appeals. Judge Hand wrote that the absolute privilege is justified because

> it is impossible to know whether the [defamation] claim is well founded until the case has been tried, and . . . to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

*Id.* at 661 (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) *quoted in Noble,* 539 P.2d at 661.).[4]

In 1993, the Arizona Supreme Court addressed a defamation suit by two police officers against a town council member for statements made during a council meeting. *Sanchez v. Coxon,* 175 Ariz. 93, 854 P.2d 126, 127 (1993). The Arizona court also adopted the second Restatement of Torts rule, employing the reasoning articulated

in *Noble* and citing the need to "attract[ ] qualified council members," promote "candor" in the local legislative process, and avoid "the chilling effect accompanying a qualified privilege." *Id.* at 129. The court reasoned that local lawmakers sometimes "legislate on matters of more immediate importance to their electorate than state or federal legislators." *Id.* at 130. Absolute immunity was therefore extended to statements "made by a town council member at a formal council meeting during the course of that meeting." *Id.*

The council member statements at issue in *Sanchez* involved criticism of local police officers in the performance of their duties. *Id.* at 127. The plaintiffs in *Sanchez* argued that absolute legislative privilege should not apply, because "the content of the statements (complaints about police officers' official conduct) was executive or administrative, rather than legislative" in nature. *Id.* at 130. A similar argument could apply to the statements at issue in this case, which involved the conduct of watershed district board members with respect to salaries and other internal administrative affairs. The Arizona Supreme Court in *Sanchez* rejected a distinction based on the content of the legislator's statements. *Id.* The court explained that "[i]t is the occasion of the speech, not the content, that provides the privilege." *Id.* This reasoning is also reflected in the Restatement (Second) of Torts § 590 cmt. a, which provides that

> legislative officers . . . are absolutely privileged in publishing defamatory matter while they are performing a legislative function although the defamatory matter has no relation to a legitimate object of legislative concern.

---

**4.** *Gregoire* was an executive privilege case, but its reasoning has been adopted in the context

of legislative privilege. *See, e.g., Voelbel,* 747 A.2d at 253.

The Arizona court explained that "[a]ny other rule would frustrate the purposes for which immunity is granted"—that is, the policy decision to protect legislators from defending lawsuits arising out of the performance of their duties. *Sanchez,* 854 P.2d at 130.

More recently, the New Hampshire Supreme Court adopted the same reasoning in *Voelbel v. Town of Bridgewater,* 144 N.H. 599, 747 A.2d 252 (1999). The New Hampshire court held that a town selectman was entitled to absolute privilege for comments "made at the town meeting, involv[ing] issues arising from [his] duties, related to a matter of local importance, and involv[ing] a matter properly before the town meeting" even though the specific topic was not "listed as a subject" on the agenda. *Id.* at 253.

Cases from the United States Supreme Court on related topics provide further support for my position that absolute legislative privilege should be extended to members of local legislative bodies. In a 1951 case against members of a California legislative committee, the Court addressed "[t]he privilege of legislators to be free from . . . civil process for what they do or say in legislative proceedings." *Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The Court explained the political principles that underlie the absolute legislative privilege using the words of founder and legal theoretician James Wilson, an influential member of the Committee on Detail, which was responsible for placing the Speech and Debate Clause in the Federal Constitution. Wilson said that

> [i]n order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and . . . be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence.

II *Works of James Wilson* 38 (Andrews ed. 1896) *quoted in Tenney,* 341 U.S. at 373, 71 S.Ct. 783. The Court went on to explain why a qualified privilege would be insufficient, stating that the legislative privilege protects

> uninhibited discharge of . . . legislative duty, not for . . . private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

*Tenney,* 341 U.S. at 377, 71 S.Ct. 783.

In a later case quoting the foregoing language from *Tenney,* the Court made clear that "[t]his reasoning is equally applicable to federal, state, and regional legislators." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 405, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). The Court accordingly granted immunity from federal damages liability to the members of the Lake Tahoe Regional Planning Agency, an unelected body created by California and Nevada "to adopt and to enforce a regional plan for land use, transportation, conservation, recreation, and public services." *Id.* at 394, 99 S.Ct. 1171.

*Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), provides additional and informative policy discussion regarding the rank of legislative officials as it relates to immunity. In *Bogan,* the plaintiff brought a 42 U.S.C. § 1983 action against a mayor and city council members, alleging that the elimination of the city department that employed him violated his constitutional rights. 523 U.S.

at 47, 118 S.Ct. 966. The Supreme Court held that local legislators, like legislators at higher levels, are "absolutely immune from suit under § 1983 for their legislative activities," *id.* at 49, 118 S.Ct. 966, because "the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability," *id.* at 52, 118 S.Ct. 966. The Court went on to reason that local "part-time citizen legislator[s]" especially merit the protection of immunity because "the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability." *Id.* at 52, 118 S.Ct. 966.

Finally, I find the analysis in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)—reasoning that we adopted in *Carradine*—especially relevant. In *Barr,* the Supreme Court extended absolute privilege to statements made by the director of an executive government agency. *Id.* at 574, 79 S.Ct. 1335. The Court rejected a bright-line rule awarding the privilege to executive officers solely based on rank. *Barr,* 360 U.S. at 572–73, 79 S.Ct. 1335, *cited in Carradine v. State,* 511 N.W.2d 733, 735 (Minn.1994). In *Barr,* the Court explained that "the duties with which the particular officer ... is entrusted" and "the relation of the act complained of to matters committed by law to his control or supervision" guide the scope of the absolute privilege, rather than "the title of [the] office." *Barr,* 360 U.S. at 573, 79 S.Ct. 1335 (citation omitted) (internal quotation marks omitted).

The diverse collection of authorities discussed above underlies my disagreement with the majority. I have carefully considered the position of the first Restatement of Torts, which granted absolute privilege to only a state's highest legislative bodies, and the second Restatement of Torts,

which broadened the application of absolute legislative privilege to cover local legislative bodies as well. Our cases on absolute legislative privilege create a somewhat unclear picture of our stance on this issue to date. We adopted the bright-line rule of the first Restatement in *Jones v. Monico,* 276 Minn. 371, 375, 150 N.W.2d 213, 216 (1967), but we have also stated, at least in dicta, that absolute privilege extends to "all legislative bodies, state or municipal." *Peterson v. Steenerson,* 113 Minn. 87, 89, 129 N.W. 147, 148 (1910). And in recent decades, the majority of courts to consider this issue have adopted the modern rule embraced in the second Restatement.

Having reviewed the reasoning that underlies both the traditional rule and the modern rule, I find myself compelled to conclude that a change in Minnesota's law regarding absolute legislative privilege should be made in this case. The majority asserts that "the reasoning underlying the holdings in *Burch* and *Jones* is not sound," and therefore leaves the *Jones* rule intact. I agree with the majority that stare decisis is a very important value, but I believe the public interest at stake in this case is more than sufficient to support a change in the law.

In *Burch* and *Jones,* we provided no substantive analysis to explain our choice to use only the qualified privilege. In *Jones,* 276 Minn. at 375, 150 N.W.2d at 216, we simply said that the qualified privilege provides "sufficient protection" for members of subordinate legislative bodies without explaining why that is so. We did no more than follow what was at the time the majority rule without considering the alternatives. *Id.* at 375, 150 N.W.2d at 216. And in *Burch,* we provided no explanation at all of our reasons for applying only a qualified privilege. *See Burch v. Bernard,* 107 Minn. 210, 211–12, 120 N.W. 33, 33–34 (1909).

I therefore take issue with the majority's suggestion that I have ignored sound reasons underlying the traditional rule. I have searched carefully for such reasons in our cases and found them to be few and lacking in merit. Moreover, cases from other states following the traditional rule provide little assistance in articulating support for that rule. *Mills v. Denny*, 245 Iowa 584, 63 N.W.2d 222 (1954), is the only case that engages in any substantive analysis in support of the rule, and I find the reasoning in *Mills* unpersuasive. The Iowa Supreme Court distinguished the state's highest legislative bodies from subordinate bodies on the basis that the highest bodies provide additional "supervision and control by other authorities" and greater standards of "decorum." *Id.* at 225. I agree with experts on the subject who conclude that these arguments are dubious at best. *See* Sack, *supra*, § 8.2 (criticizing this reasoning for the traditional rule); Restatement (Second) of Torts § 590 (1977) (adopting the modern rule).

The reasoning supporting adoption of the modern rule is persuasive and voluminous by comparison. Broader application of absolute legislative privilege encourages participation in public service by capable citizens at the local level, where much important legislative decision making occurs. Local public servants often receive little or no compensation for their efforts, and without absolute privilege, "prestige and pecuniary rewards may pale in comparison to the threat of civil liability." *Bogan v. Scott–Harris*, 523 U.S. 44, 52, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). Exposure to defamation suits might therefore discourage "all but the most resolute, or the most irresponsible," from taking on the burden of public service. *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949).

Even more significantly, adoption of the modern rule would provide necessary protection for the public's interest in free and open legislative debate. *See, e.g., Sanchez v. Coxon*, 175 Ariz. 93, 854 P.2d 126, 129–30 (1993) (adopting the modern rule in part to promote "candor" in the legislative process). The public would be better served if legislative decision makers at all levels of government feel free to present relevant information in the discharge of their duties, without fearing "the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Like Judge Hand, I believe that the threat of defending oneself in a lengthy and expensive lawsuit chills legislative speech nearly as much as the threat of ultimate liability. *See Gregoire v. Biddle*, 177 F.2d at 581.

The majority asserts that my key reasons for favoring the modern rule—diminishing disincentives to public service in local government and encouraging free and open legislative speech by members of local legislative bodies—are not supported by record evidence showing any ill effects of the current rule. But such criticism applies equally to the majority, given that the record also contains no evidence for the premise underlying the majority's preferred conclusion. We have no evidence that any defamatory speech by any member of a Minnesota legislative body has ever had "personally crushing and career-ending" effects for a citizen. I take a more optimistic view of our state's public servants and believe that the vast majority are hardworking and honest in their service of the public.

I acknowledge that empirical studies would be valuable in a case like this where we must weigh competing public policy interests in an attempt to identify the best rule of law, but we have never *required* such evidence before making a decision. Here, I am aware of no relevant studies in

existence. In balancing the interests at stake—open legislative debate versus the risk of unredressable harm from defamation—I would rely on the overwhelming and well-reasoned federal and state precedent that supports adoption of the modern rule, especially our own highly relevant precedent in *Carradine v. State*, 511 N.W.2d 733, 735 (Minn.1994).

For all of the foregoing reasons, I conclude that the qualified privilege provides insufficient protection for members of local legislative bodies. Therefore, to the extent that *Jones v. Monico*, 276 Minn. 371, 150 N.W.2d 213 (1967) applies to the facts and circumstances of this case, I would overrule that case. Extensive authority from other jurisdictions on the topic and the trend of our own cases support that result. We have already recognized the importance of the absolute privilege for lower-level officials in the executive ,context in *Carradine*, 511 N.W.2d at 735, and I see no reason why a distinction based solely on the rank of the official should carry more weight in the legislative context than in the executive. I believe the court of appeals was correct in reading *Carradine* as a shift in our jurisprudence away from the *Jones* bright-line rule, a

shift made in order to " 'aid in the effective functioning of government' " at the local level. *Carradine*, 511 N.W.2d at 735 (quoting *Barr*, 360 U.S. at 573, 79 S.Ct. 1335). I would make that shift explicit and hold that members of local legislative bodies are protected by the absolute legislative privilege against defamation suits for statements made in the performance of a legislative function.

*Carradine* requires that we consider "the nature of the function assigned to the officer and the relationship of the statements to the performance of that function." 511 N.W.2d at 736. Minnesota's watershed districts are significant public bodies with considerable authority to carry out important legislative functions. *See, e.g.*, Minn.Stat. § 103D.335 (2008). The public interest demands that watershed district board members carrying out their official duties, like state legislators and like police officers making official reports, have the freedom to report information in carrying out those functions without fear of facing lawsuits for defamation. I therefore conclude that the board members of the Middle Snake Tamarac Rivers Watershed District are entitled to the protection of the absolute privilege.[5] Because Nelson

5. The majority relies heavily on the fact that watershed district board members are appointed by elected officials, rather than elected directly. Such officials are therefore arguably less accountable to the public. I agree that this is a relevant consideration in assessing the balance between the competing interests in this case. Ultimately though, this factor does not change my conclusion. Members of the public have a powerful interest in free and open debate during proceedings of local legislative bodies, and I do not think that interest is less in the case of a watershed district than a city council or other elected body. *Cf. Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (granting immunity from federal damages liability to members of an unelected regional resource management agency with functions analogous to those of a watershed district). I see no effect of election versus appointment on this side of the balance.

Regarding an individual's interest in a remedy for defamation, I note that appointed board members are subject to public criticism and are accountable to the public through the elected officials who appointed them. Although this accountability is indirect, I do not believe that unelected members of our state's vitally important local legislative bodies are significantly more likely to maliciously defame members of the public they serve than directly elected ones. I therefore conclude that absolute privilege is equally important for all local legislative bodies, elected and appointed alike, and would hold that the absolute legislative privilege applies to both.

and Stroble made their allegedly defamatory statements during an official watershed district board meeting, I would hold that their alleged statements are absolutely privileged and that the district court therefore properly granted their motion for judgment on the pleadings.